Filed 10/7/13  P. v. Gomez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDGAR GOMEZ,<br><br>    Defendant and Appellant. | B235186<br><br>(Los Angeles County<br>Super. Ct. No. BA363401) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed as modified.

Law Offices of Okabe & Haushalter, Mark J. Haushalter, Brian A. Newman and Christine J. Esser for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Edgar Gomez appeals from a judgment of conviction entered after a jury trial.  The case involves a gang-related shooting that was caught on video camera.  The primary issue at trial was the identity of the killers.

The jury convicted Gomez of first degree murder (Pen. Code, § 187) and found true the allegations he personally and intentionally discharged a firearm in the commission of the crime (*id*., § 12022.53, subds. (d), (e)) and committed the crime for the benefit of a criminal street gang (*id*., § 186.22, subd. (b)(1)(C)).  The trial court sentenced Gomez to state prison for a term of 50 years to life.

On appeal, Gomez challenges the sufficiency of the evidence to support his conviction.  He also argues that the judgment should be reversed because of evidentiary error, prosecutorial misconduct, ineffective assistance of counsel, sentencing error, judicial bias, and an erroneous restitution order.  We correct the amount of the restitution order and otherwise affirm the judgment.

# FACTS

A. *The Shooting*

On July 29, 2008 at approximately 8:00 p.m. two members of the Eastside Trece gang murdered Marcus Van Ellis because he was wearing red, the color of a rival gang.  The two gang members shot 10 to 15 rounds at Van Ellis as he fled.  Van Ellis was shot five times, including once in the back.  Van Ellis was transported to Los Angeles County Medical Center, where he was pronounced dead at 9:45 p.m. from multiple gunshot wounds.

The murder occurred on East Adams Boulevard between Stanford Avenue to the west and Griffith Avenue to the east, about 100 feet from the Griffith Avenue intersection.  Ace Liquor is at the northwest corner of the Griffith Avenue intersection, a childcare center is west of the liquor store at 853 East Adams Boulevard, and a single

2

family residence is west of the childcare center, at 847 East Adams Boulevard. Van Ellis was shot in front of the single family residence. The East Side Trece gang, a Latino gang, and the 20 Outlaws, an African-American gang, controlled the area where Van Ellis was killed.

B.    *The Eyewitnesses*

1.    Erick Cuevas

Erick Cuevas was watching television in his third-floor apartment on the south side of East Adams Boulevard, west of Griffith Avenue, when he heard a gunshot and looked out the window. He saw an African-American man running west on Adams in the middle of the street, approximately 20 to 30 feet from Cuevas. It was still daylight and there was nothing obstructing his view. Cuevas saw two Latino men wearing blue clothing running from the southwest corner of Adams and Griffith and chasing the African-American man. They had their arms extended and fired 10 to 15 shots. The two Latino men appeared to say something, but Cuevas could not hear what they said. After the African-American man fell to the ground, the two Latino men ran back toward Griffith. Cuevas then heard the sound of screeching tires.

According to Cuevas, one of the Latino men was 25 to 26 years old, five feet, four or five inches tall, with a "thicker" build, wearing long baggy pants and a blue hat. The other man was 20 to 22 years old, about the same height, with a "skinny" build, wearing baggy checkered shorts down to his ankles. Cuevas' brother called the police to report the shooting.

2.    Arlene Stewart

Arlene Stewart was at a telephone booth near a Tam's hamburger stand at 28th Street and Central Avenue when a black Cadillac caught her attention.[1] The Cadillac was

---

[1]    Central Avenue is two blocks east of Griffith Avenue, and 28th Street is two blocks south of East Adams Boulevard.

3

headed west on 28th Street, and it turned right toward East Adams Boulevard.  The Cadillac "wasn't going that fast," and Stewart felt "[i]t was up to something.  You know, I just had a funny feeling."

The driver's side window was halfway down, and Stewart saw three Latino men in the car.  She recognized Gomez, who was sitting in the back seat, as someone she had known for several years, although she did not know his name.  She also recognized the Cadillac because she had seen it before in the neighborhood.  She "stood out in the street to watch" the car because she "was kind of leery that something was wrong."

As Stewart was walking north toward 27th Street she saw the Cadillac turn left into a Valero gas station on the southwest corner of East Adams Boulevard and Central Avenue or into an alley near the gas station.  A "few seconds later, [she] heard a whole bunch of gunshots."  She got scared and ran to a friend's house nearby.

### 3.    Jose Ramirez

Jose Ramirez was jogging in the area of East Adams Boulevard and Griffith Avenue.  He grew up in the area and frequently ran five to six miles a day in the neighborhood.  At the time Ramirez was in the police academy, and he subsequently became an officer with the Los Angeles Police Department.

As Ramirez was jogging on East Adams Boulevard approaching Stanford Avenue he saw two young Latino men with thin builds wearing baggy clothing and looking upset. Ramirez observed that "they immediately looked like they were canvassing the area, looking for someone," and that "one of the suspects had their hands inside their pockets," so he "stepped on to the street, kind of a way of showing them respect" in order to avoid any trouble.  Ramirez saw them "looking back and forth.  Their face, their demeanor, the body language, they looked upset, so [he] tried not to make any eye contact."  Ramirez nevertheless made eye contact with one of the men, whom he later identified as Gomez. He described Gomez as bald with a dark complexion, wearing a hooded sweatshirt and baggy jeans.  After they passed by, Ramirez "continued running, and stepped back on to the sidewalk."

4

Ramirez heard what sounded like gunfire or fireworks. He kept on running, thinking the noise was probably fireworks because "it's really common in the area for people to be popping fireworks." When he reached Stanford Avenue, he stopped. Someone told him, "You almost got shot." He looked back and saw the two Latino men running the other way. A group of people was gathering about 100 feet from the Griffith Avenue intersection.

C.     *The Investigation*

1.     Los Angeles Police Officer Sharlton Wampler

Officer Sharlton Wampler was one of the first officers to arrive on the scene. He observed Van Ellis unconscious on the sidewalk and a group of 10 to 15 people "at varying distances approaching to see what had happened." Other officers began to arrive quickly. Officer Wampler interviewed two witnesses, Luis Salas and Trevon Smith, who gave him information about a black Cadillac. Officer Wampler had stopped a black Cadillac containing two "individuals that were from a gang within that certain area" several weeks earlier.

2.     Los Angeles Police Detective Rudolfo Chong

Homicide Detective Rudolfo Chong, who was assigned to investigate the shooting, arrived at about 11:10 p.m. and spoke with officers on the scene. Detective Chong obtained the evidence the officers had collected from the area, including bullet jackets and fragments, but no expended shell casings. He observed bullet holes and impact marks at the childcare center and the residence to the west of it. He also observed bullet holes in and bloodstains on a car parked in a driveway just to the west of the residence.

One of the officers at the scene told Detective Chong that the security camera at the childcare center might have recorded the shooting. Detective Chong contacted the owner of the center and was able to view the video recording. The recording showed an unidentified Latino man wearing orange shorts, standing next to a black truck parked on the north side of the street. It also showed two men chasing Van Ellis. One of the two

5

men appeared to be about five feet, four inches tall.  The other man was about five feet, six inches tall and thinner.  Gomez is five feet, one inch tall.

The recording showed Van Ellis wearing a black shirt and red shorts.  In that area red shorts signify the Rolling 20's Blood gang.  Detective Chong determined that Van Ellis was not a gang member, but he lived at 817 East Adams Boulevard, which was a Rolling 20's hangout.

The recording also showed a dark-colored Cadillac with soft or different-colored top.  Detective Chong was interested in the car because the shooters came into the picture about 30 seconds after the Cadillac turned onto Griffith Avenue.  After the shooting, the shooters ran back in the direction the Cadillac had travelled.

Detective Chong spoke to Officer Wampler, who told him he had stopped a black Cadillac with East Side Trece gang members in it in the same area.  He had written a ticket and impounded the Cadillac.  He remembered that the registered owner of the Cadillac lived on City Terrace Drive.

Detective Chong then spoke to Luis Salas, one of the witnesses who had spoken to Officer Wampler about the black Cadillac on the night of the shooting.  Salas said that the car was a green Cadillac with a brown top, and he had seen it driven by an older man who worked at the police garage.  Salas also said that the suspects had entered a black Cadillac and had shouted the name of their gang, the East Side Trece gang.[2]  A couple of days later, Salas told Detective Chong that the Cadillac had tinted windows and whitewall tires.

Detective Chong was unable to interview Trevon Smith, the other witness who had spoken to Officer Wampler.  Smith had told Officer Wampler that the car was a black Cadillac with a rag top.  He described it as an 80's to 90's sedan, possibly grey, and said he saw it parked on the west side of Griffith Avenue, south of East Adams

---

[2]     The trial court instructed the jury that Salas's statement was not admitted for the truth but to explain Detective Chong's subsequent actions.

6

Boulevard. Some of the 911 callers who reported the shooting also described the car as a black Cadillac with a rag top.

Detective Chong went to the City Terrace Drive address of the registered owner of the black Cadillac that Officer Wampler had stopped and took photographs of the car. It had a hard top and did not have tinted windows or whitewall tires.

Nine months after the shooting, on April 29, 2009, Detective Chong showed Cuevas a binder containing five pages of photographs, each page containing six photographs of Latino men. Detective Chong asked Cuevas if he saw a photograph of either of the men who shot Van Ellis. While Cuevas recognized two of the men in the photographs, neither was the shooter. He explained to Detective Chong that he did not focus on the shooters' faces and he did not remember the faces.

### 3. Los Angeles Police Detective Julio Benavides

Homicide Detective Julio Benavides took over investigation of the case from Detective Chong. Detective Benavides used a computer to generate a six-pack photographic lineup containing a photograph of Gomez. On October 8, 2009 he showed the lineup to Ramirez. Ramirez identified Gomez as the man with whom he made eye contact before the shooting.[3]

On October 13, 2009 Detective Benavides spoke to Cuevas at his apartment. Although Cuevas said that he did not see anyone's face, Detective Benavides asked him to come with him to the police station. At the station Detective Benavides showed the photographic lineup to Cuevas. Cuevas identified Gomez's photograph and wrote, "I saw him running and shooting at the black guy and running back to the corner, Griffith."[4]

---

[3] On cross-examination Ramirez said he was about 70 percent sure of his identification.

[4] On cross-examination Cuevas testified that he had only seen the shooters' faces for a few seconds, and he told the public defender's investigator that he was 60 percent sure of his identification of Gomez. He also testified that he felt pressured by Detective Benavides to make an identification.

Detective Benavides also spoke to Stewart in October 2009. While it did not appear that she had given any useful information to Detective Chong, Detective Benavides wanted to check her level of cooperation and determine whether she had information that would help with his investigation. Stewart was in prison at the time of her interview. Detective Benavides did not make any promises to Stewart in exchange for her cooperation.

Stewart told Detective Benavides what she had observed. He showed her the photographic lineup, and she identified Gomez as one of the two men she had seen in the back seat of the Cadillac. She also identified Daniel Salgado and Miguel Diaz as the other two men in the car.

D.    *Gomez's Arrest and the Search of His Cell*

Gomez was arrested on October 14, 2009 at his residence at 1101½ East 29th Street, where Gomez lived with his grandmother and uncle. Detective Benavides searched the residence and recovered from one of the bedrooms a number of items marked with gang graffiti, including a yearbook, a tissue box with "Midget" and "Eastside X3" written on it, and a blue "L.A." cap. Detective Benavides also obtained a piece of mail with Gomez's name on it addressed to 1101½ East 29th Street and "oversized" male clothing. He noted that "[t]here were other people in the residence, and nobody else claimed that bedroom." Detective Benavides walked across East 29th Street and photographed gang graffiti in the area and on a warehouse "on the south side of 29th street directly across from where Mr. Gomez was living at the time," including the notations "ES13," "20K," "30K," and "X3." There also were walls covered in blue graffiti.

On May 12, 2011, during the trial, Los Angeles County Deputy Sheriff David Rodriguez searched Gomez's cell at the Men's Central Jail. Deputy Sheriff Rodriguez found a folder containing personal papers, a handwritten document, and a document entitled "Brownside 13 reasons lyrics." Brownside is the name of a hip hop group, and the jury heard one the group's songs played in court. The handwritten document and the

8

document entitled "Brownside 13 reasons lyrics" found in Gomez's cell contained words similar to the lyrics of the Brownside song.

The handwritten document contained the lines, "so if you putos see me coming, putos go for your strap." It also contained the lines, "Thirteen here comes even more . . . homies breaking down the door, talking 'bout how we gon kill, man. Just grab ur gun. We gon kill some . . . tintos." "Strap" is slang for "gun" and "tintos" is a derogatory term that Latino gang members use to refer to African-Americans.

### E. *Gang Evidence*

Los Angeles Police Officer Ronald Berdin, assigned to the Newton Division Gang Enforcement Detail, testified as an expert on the Eastside Trece or Eastside 13 gang. Officer Berdin testified that Eastside 13 was formed in the late 1970's or early 1980's. He explained that "[a]s with the way that most gangs get started, a group of individuals who were tired of being victimized started this particular gang within this particular area, and they formed up as a group to protect themselves from rival gang members." The gang currently had about 90 members and as of the time of trial Officer Berdin had spoken with 30 to 40 of them. The gang's territory was bordered by East Adams Boulevard on the north, 32nd Street on the south, Hooper Avenue on the east, and Griffith Avenue on the west. Its main rival gangs were the two Blood gangs, the Rolling 20 Outlaws and the Rolling 30 Pirus, which has a close alliance with the 20 Outlaws. The gangs had been fighting since 2005 or 2006, when members of the Rolling 20 Outlaws and Rolling 30 Pirus believed an Eastside 13 member had killed one of their members, which led to escalating retaliation. Officer Berdin stated that the particular feud between these three gangs was one of the most active he had seen during the 16 years he had been on the job.

The primary activities of Eastside 13 included vandalism, robberies, assaults, and murder. "[B]ut ultimately their main activity, as with most gangs, is they hang out . . . with one another regularly. That, in and of itself, creates a sense of fear and intimidation

9

within a community." Officer Berdin gave examples of two Eastside 13 gang members who had been convicted of attempted murder, one in 2005 and one in 2006.

Officer Berdin explained that in gang culture, "respect is everything." A young individual who joins a gang must gain the respect and trust of the other gang members. To do that, he must commit crimes and show his willingness to participate in gang activities. The more serious the crime, the more respect is earned. Gangs use the term "putting in work" to mean committing crimes, such as confronting rival gang members, going into their territory and putting gang graffiti on their walls, and committing crimes in their territory.

Officer Berdin looked at photographs of the graffiti by Gomez's house. He testified that "ES13" represented Eastside 13. "LS" represented Locos, a subset of Eastside 13. Below "LS" was the name "Midget," indicating the name of the person who wrote the graffiti. Additionally, "20K" and "30K," both crossed out, indicated the writers were killers of members of the Rolling 20 Outlaws and Rolling 30 Pirus gangs.

Officer Berdin knew that Gomez, Salgado, and Diaz were members of Eastside 13 from contacts with them by him and other officers, and from photographs. Gomez told Officer Berdin in 2008 that he was a member of Eastside 13 and his gang moniker was "Midget." Gang writing on the items obtained from Gomez's residence represented Eastside 13. An envelope on which the numerals 2 and 3 had been crossed out indicated disrespect for the Rolling 20 Outlaws and the Rolling 30 Pirus. The yearbook had writing in it stating that Eastside 13 had killed someone.

Matthew G., Edgar Gomez's 14-year-old cousin, testified for the defense. At the time Gomez was arrested in October 2009 Matthew G. was 11 or 12. He lived at 1101½ East 29th Street with his grandmother and Gomez and testified that the yearbook the police found when they searched the residence belonged to him, not Gomez.[5] Matthew

---

[5] On cross-examination Matthew stated that Gomez did not live at the 29th Street residence, but would come over so that his grandmother would heal cuts on his body, including one time "a mean cut on his left leg."

G., who was not in a gang, said that he wrote the gang graffiti and other statements in the yearbook because he thought the writing was cool and funny, although he later realized it was dumb to write those things. Matthew G. explained: "Well, back then when I was a kid, I used to see it on the street and stuff, and I would be like, wow, you know, it's cool writing, like I would want to have like cool writing like that, you know. So like I would like just write, like try to write like that to have like my own style."

Officer Berdin viewed the video recording from the childcare center. Based on the recording and a hypothetical question mirroring the facts of the case, he characterized the crime as "the epitome of what . . . a gang-related shooting is." The crime occurred in Rolling 20 Outlaw and Rolling 30 Pirus territory, and Van Ellis was wearing red shorts, common clothing worn by members of the two Blood gangs.[6] In addition, by committing this crime during the day, Eastside 13 members were sending a message to witnesses that they could commit this type of crime at any time without fear of retribution or identification. Such conduct would instill fear and make witnesses unwilling to come forward when the gang members committed crimes, and allow gang members to continue committing crimes without fear that they would be caught.

F.     *Expert Testimony Regarding Eyewitness Identification*

Dr. Kathy Pezdek is a cognitive psychologist who testified as an eyewitness identification expert for the defense. She reviewed the police reports, transcripts of witness interviews, and the video recording of the incident. Dr. Pezdek testified that when someone sees a person very briefly, he or she does not remember that person exactly, as he or she would a photograph or video. Thus, the video recording of the incident was not representative of what a witness would remember.

According to Dr. Pezdek, there are five factors affecting the accuracy of eyewitness identifications. The first is the exposure time or the amount of time the

---

[6]     Officer Berdin testified that Van Ellis was an associate of the Rolling 30 Pirus gang. He congregated with gang members but did not commit crimes.

witness was able to view the face of the perpetrator. The less exposure time, the less accurate the identification. The second factor is distraction, which relates to other activity occurring at the time the witness viewed the perpetrator. The greater the distraction, particularly in the form of another participant in the crime, the less time the witness has to view the perpetrator. The third factor, time delay, is a "big factor" in terms of the reliability of an eyewitness identification. Dr. Pezdek explained that memory is not a perfect storage system and fades with the passage of time. The longer the delay in making an identification, the higher the misidentification rate. The fourth factor is experimenter expectancy. If the officer conducting a photographic lineup knows the identity of the suspect, the officer might inadvertently give clues to who the suspect is. If the eyewitness is unsure of his or her ability to make an identification, he or she might look to the officer for suggestions or guidance. The fifth factor is an admonition given to the eyewitness at the time of the photographic lineup that the suspect may or may not be in the lineup. This warning reduces the probability of a misidentification.[7] Dr. Pezdek cautioned that even well-intentioned eyewitnesses trying to do their best are going to make misidentifications.

## DISCUSSION

I.    SUFFICIENCY OF THE EYEWITNESS IDENTIFICATION EVIDENCE

A.    *Gomez Waived His Objection to the Admission of the Eyewitness Identification Evidence*

Gomez characterizes the eyewitness identification evidence as "inherently improbable" and contends it is insufficient to prove he was one of the shooters. As the

---

[7]    Detective Benavides gave Cuevas this admonition.

12

People point out, however, Gomez did not object to the admission of the eyewitness identification evidence at trial.

The failure to object to the admission of eyewitness identification evidence waives any challenge to its admission on appeal. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989; see Evid. Code, § 353.) "This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.]" (*In re Seaton* (2004) 34 Cal.4th 193, 198; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1116, fn. 20 [failure to raise due process claims with respect to the admission of evidence by objection at trial waives those claims on appeal].) Thus, to the extent Gomez is arguing that the admission of "inherently improbable" eyewitness identification evidence violated his due process rights, Gomez waived the argument by failing to object in the trial court.

Gomez also waived his argument that the identification procedure was unduly suggestive. The transcript of Detective Benavides' interview with Cuevas where Cuevas identified Gomez's photograph reads as follows:

"DETECTIVE BENAVIDEZ [*sic*]: So I read you the admonition, I want—the—the admonition about this photo lineup. I want you to look at these pictures and do the right thing, Erick, okay. Which of these pictures do you think—brings something back to memory for you? That one? Number Five?

"ERICK CUEVAS: Yeah. I guess, yeah.

"DETECTIVE BENAVIDEZ [*sic*]: Number Five?

"ERICK CUEVAS: Yeah, Number Five."

The transcript does not show whether Detective Benavides suggested Number Five and Cuevas then picked that photograph, or whether Cuevas first selected Number Five and Detective Benavides then sought to confirm his selection. Both attorneys questioned Cuevas at trial regarding his identification of Number Five. Cuevas stated that Detective Benavides did not make him think that that the suspect was definitely in the group of photographs Detective Benavides showed him, and that he selected Number Five "because it looked like the guy." Cuevas also testified that he suggested photograph

13

Number Five, and that Benavides then asked him "Is it photo No. 5?"  Had defense counsel objected to the identification based on the transcript, the trial court could have held a hearing to determine whether the identification procedure was unduly suggestive and therefore should have been excluded.  (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989; see *People v. Avila* (2009) 46 Cal.4th 680, 700 [defendant has "the burden of demonstrating the identification procedure was unduly suggestive"]; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 [defendant "bears the burden of showing unfairness as a demonstrable reality, not just speculation"].)  In the absence of an objection and hearing, Gomez's claim that the identification procedure was unduly suggestive is speculative and waived.  (*Cunningham*, *supra*, at p. 989; *DeSantis*, *supra*, at p. 1222.)

B.    *There Was Sufficient Evidence of Identification*

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict.  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see *People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)  This standard

14

applies to the sufficiency of eyewitness identification evidence to support a conviction. (See *People v. Williams* (1997) 16 Cal.4th 153, 248; *People v. Cuevas* (1995) 12 Cal.4th 252, 274-275.)

Gomez points to problems with the eyewitness identifications in this case, including discrepancies between his appearance and the initial descriptions given by the witnesses, Dr. Pezdek's factors that increase the likelihood of misidentification, the witnesses' lack of complete certainty about their identifications, and the lack of physical evidence connecting Gomez to the crime. None of these issues mandates reversal of Gomez's conviction based on insufficiency of the evidence.

"Weaknesses in the testimony of eyewitnesses are to be evaluated by the jury. [Citation.]" (*People v. Mendez* (2010) 188 Cal.App.4th 47, 59.) We can reject an eyewitness identification that the jury has accepted only if the eyewitness's testimony is physically impossible, or the falsity of the identification is apparent without resorting to inference or deduction. (*People v. Thompson* (2010) 49 Cal.4th 79, 124.) A jury's finding on the believability of an eyewitness identification "will not be reversed unless it is clearly shown that under no hypothesis is there sufficient evidence to support it. [Citation.]" (*Mendez*, *supra*, at p. 59.) "'[C]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161-162.)

Three eyewitnesses identified Gomez as one of the shooters. Counsel for Gomez had the opportunity to cross-examine the witnesses regarding the accuracy of their identifications of Gomez. Gomez presented Dr. Pezdek's testimony on the factors affecting the accuracy of eyewitness identifications. Defense counsel had the opportunity to argue to the jury the reasons that the identifications were unreliable. "Under these circumstances, the jury was able to evaluate the credibility of [the eyewitnesses' identifications], and the weight [their] testimony deserved was for the jury to resolve. . . .

15

[¶] In sum, there was substantial evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that [Gomez] was [Van Ellis's] murderer." (*People v. Boyer* (2006) 38 Cal.4th 412, 481.)

C.       *The Amended Information Had No Effect on the Verdict*

The original information filed on May 10, 2010 alleged that the murder occurred on or about July 29, 2009. The "2009" was crossed out at some point and "2008" was handwritten above it. At the start of trial on May 4, 2011, the trial court told the prospective jurors that the information alleged a murder occurring on or about July 29, 2008. The People filed an amended information on May 15, 2011, again alleging that the murder occurred on or about July 29, 2009, and Gomez was arraigned on the amended information on May 16, out of the presence of the jury.

Gomez argues that the amended information superseded the original (*Muns v. Superior Court* (1955) 137 Cal.App.2d 728, 732), and that it was impossible for him to have murdered Van Ellis on July 29, 2009. Gomez argues that as a result of the typographical error on the amended information, the verdict was based on a void document and the resulting confusion caused by the amended information requires a new trial. (See *People v. Mack* (1961) 197 Cal.App.2d 574, 580-581.) As a general rule, however, a defendant's failure to demur to an information waives any issue regarding the information. (See *People v. Kemp* (1961) 55 Cal.2d 458, 474; *People v. Ramirez* (2003) 109 Cal.App.4th 992, 997.) In any event, where the date the crime was committed is not material to the offense, "the evidence is not insufficient merely because it shows the offense was committed on another date." (*People v. Peyton* (2009) 176 Cal.App.4th 642, 660.) In addition, because the trial court did not read the amended information to the jury, the amended information with the incorrect year on it could not have caused any confusion or prejudice.

16

II.     INTRODUCTION OF GANG EVIDENCE

Gomez challenges the introduction of the yearbook found in his residence, the police notebook on the Eastside 13 gang, and the rap song lyrics found in his cell.  He contends the evidence was irrelevant, inflammatory, and prejudicial, mandating reversal of his conviction.  The trial court, however, did not abuse its discretion in admitting any of this evidence.

A.     *Standard of Review*

We review the trial court's decision to admit evidence pertaining to gangs and gang membership for abuse of discretion.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1194; *People v. Waidla* (2000) 22 Cal.4th 690, 717.)  Gang evidence is admissible when it is relevant to a material issue at trial.  As the California Supreme Court has stated, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  Gang evidence is admissible "when the very reason for the crime is gang related."  (*People v. Ruiz* (1998) 62 Cal.App.4th 234, 239; see *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

Evidence Code section 352 gives the trial court the discretion to exclude relevant evidence if the probative value of the evidence is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice, confusing the issues, or misleading the jury.  (*People v. Harris* (2013) 57 Cal.4th 804, 845.)  We will not disturb the trial court's exercise of its discretion on appeal unless the court has abused its discretion (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070), in other words, if its decision exceeds the bounds of reason (*People v. DeSantis*, *supra*, 2 Cal.4th

at p. 1226). Gang evidence does have a potential for prejudice. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1194; *People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) When it meets the test of relevancy, however, it is admissible unless its prejudicial effect clearly outweighs its probative value. (*Carter*, *supra*, at p. 1194; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905.)

> B.     *The Trial Court Did Not Abuse Its Discretion in Admitting the Evidence of Gang Membership*
>
> 1.     The Yearbook

Counsel for Gomez first objected to the admission of the yearbook on the ground "there is no correlation, basically what it is, it's a middle school yearbook from 2007. I don't believe it belongs to my client." The trial court asked where the police found it, and Detective Benavides responded that the police found it in the house where the officers arrested Gomez. The trial court stated that was probably enough to connect the yearbook to Gomez and that the defense could argue that it was not Gomez's.

Counsel for Gomez's second objection was that there were some inflammatory writings in the yearbook that might prejudice the jury. For example, there was a picture of an African-American girl with an X through the picture with the words "burn browns" written above it. The trial court pointed out "the underlying theme here in this case that this is a sort of racial gang situation where it's a Hispanic gang against an African American or Black gang," so the writings were "relevant to show racial animus." The court then asked whether the yearbook was Gomez's, and whether Gomez's picture was in the book. The prosecutor responded that the police found the yearbook in a bedroom with an envelope addressed to Gomez, with the same type of writing and Gomez's moniker on the envelope, and oversized men's clothing in the closet.

The trial court ruled: "I'm not going to let in the 'burn browns.' That's got to be taken out. I looked at the book here, and I'm going to allow the book, over their objection. I think there is probative value, the gang writing is probative, where it's found, the fact that it's found in a room where [Gomez] has various items indicating that

18

might be his room." The court noted that because there were many African-American people in the yearbook and the notation was over only one picture, with no indication of a gang motive, the court would exclude the evidence as highly inflammatory under Evidence Code section 352.

At a later break in the proceedings, the trial court noted that it had looked at the girl's picture and was not even sure she was African-American. The trial court had also looked through the entire yearbook and found other potentially prejudicial comments. The court invited defense counsel to review the yearbook to see if there were any other objections he wanted to make. The prosecutor later brought to the attention of the trial court and defense counsel a comment in the yearbook that read, "Eastside 13 smoked a nigger." The court indicated it had discretion to admit the comment to show gang membership and motive, but it would allow defense counsel to argue the issue the following day.

The following day, counsel for Gomez argued that the comment was "highly inflammatory." The trial court expressed concerns that the police had discovered the yearbook 14 months after the commission of the crime and that the comment was inflammatory. The trial court noted, however, that the comment "also, in terms of the gang culture, fits right into that area. It's an acknowledgement. It's a proud kind of statement that, you know, 'This is what we did.' And it's relevant to this case because it suggests, or at least there's a possible connection, obviously, that can be drawn that they are talking about what happened to our person who was killed in this case. So that one I'm going to have to think about. I do obviously respect and understand that that is prejudicial, highly prejudicial." The court concluded, "And, again, I am letting this in for a limited purpose, that this is indicia of gang involvement. It has 'East Side Treces' on it. [Gomez] has been identified as a member of East Side Treces by the gang expert, and it's found in a location that appears that he had access to."

Counsel for Gomez then objected to a page on which there was an X over the face of Dr. Martin Luther King, and the word "nigger" was written next to it. The trial court agreed that this page was more prejudicial than probative and would be excluded.

19

Counsel also objected to a picture of an Asian woman with an X over her face and the comments "rasist" [*sic*] and "what the fuck, Chinese bitch." The trial court sustained the objection on the ground it was irrelevant and "would clearly inflame the jury."

Counsel for Gomez brought to the court's attention one last page to which he objected. This page had an X over the picture of a African-American faculty member and the word "nigger" written on his forehead. It also had an X over the face of a White faculty member and the word "gringo" written next to it. The trial court excluded the page for the reasons previously given. The trial court added, "I just want to tell both sides I am giving strong consideration to letting in this thing that 'East Side 13 smoked a nigger,'" and invited counsel to find authority on the issue. The court also ordered the prosecutor to redact the yearbook in accordance with the court's rulings.

The next day the trial court ruled it was going to allow evidence of the comment "Eastside 13 smoked a nigger." The court conceded it was prejudicial but found the probative value outweighed the prejudicial effect. The court was prepared to give the jury a limiting instruction stating that the comment could not be considered for the truth of the matter but only as indicia of gang membership.

Later that day, the trial court discussed admission of the rap lyrics that the deputy sheriff had found in Gomez's cell the previous day. The trial court ruled the lyrics were "highly relevant" on the issue of gang membership. In addition, the court would tell the jury that if it found, by comparing the lyrics to the writing in the yearbook, that the comment in the yearbook was in Gomez's handwriting, then it could make the further determination that the comment was an admission.

Later, when counsel for Gomez questioned Matthew G. about the writing in the yearbook, including some of the handwritten comments that the trial court had previously excluded, the trial court stated, "I want to put you on notice that all bets are off now, in terms of the stuff that I struck out. [The prosecutor] can inquire about anything that's in the book. [The witness is] claiming ownership . . . of these items, and anything that's in that book she can ask about." Counsel for Gomez proceeded to question Matthew G. about the "burn browns" comment, the "Eastside 13 smokes a nigger" comment, and the

20

word "nigger" by the picture of Dr. Martin Luther King.  Matthew G. claimed he had written all of the comments.

Gomez argues that the yearbook, which Gomez refers to as "[Matthew G.]'s yearbook," and the racist comments in it were not relevant to the case against Gomez.  If the yearbook was Gomez's yearbook, however, then it was, as the trial court found, relevant and admissible on the issues of Gomez's gang membership and motive to commit the crime.  (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049; *People v. Ruiz*, *supra*, 62 Cal.App.4th at pp. 239-240.)  And whether the yearbook belonged to Gomez or Matthew G. was a factual issue for the jury.  While Matthew G. testified that it was his, the police found it in a room with items that appeared to belong to Gomez.

With respect to the comments in the yearbook that the trial court excluded but that counsel for Gomez subsequently questioned Matthew G. about, the People correctly point out that any error in the admission of those comments was invited.  Where a defendant elicits evidence previously ruled inadmissible, he cannot claim error on appeal based on the admission of the evidence.  (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139; *People v. Visciotti* (1992) 2 Cal.4th 1, 72; see *People v. Kovacich* (2011) 201 Cal.App.4th 863, 890, fn. 5 ["defendant cannot complain that testimony he elicited was admitted into evidence"].)  Moreover, it is clear that counsel for Gomez's purpose in introducing the inflammatory yearbook comments along with Matthew G.'s testimony that he wrote them was to prove to the jury that the yearbook belonged to Matthew G., not to Gomez, and that therefore Matthew G. was responsible for the admissible comment "Eastside 13 smokes a nigger."  As counsel for Gomez argued in closing:  "Now, that yearbook has got vile and vulgar and ugly language all in it.  So why did I put Matthew [G.] on? Because didn't you all think when the prosecution put that notebook on that it must have belonged to [Gomez]?  Didn't you all think that?"  The clear inference is that Matthew G. would not admit writing such ugly comments unless he, not Gomez, had actually written them.

21

2.	The Rap Song Lyrics

The rap song lyrics were discovered in Gomez's cell while the trial was in progress.  Counsel for Gomez initially objected to the rap song lyrics on the grounds that they were cumulative and their admission might require counsel to get a handwriting expert to determine whether Gomez wrote the documents.  The trial court stated that the lyrics were relevant to the issue of gang membership, but the court would give defense counsel an opportunity to obtain a handwriting expert if counsel wanted to do so.

After reading the lyrics the trial court noted one of the documents was "chock-full of statements about the gang:  'Eastside 13 is a motherfucking gang.  Letting everyone know that we're some fucking criminals.  The rest in control, 13th Street now.'  Then he goes on to become more explicit, in which he talks about references to 'strap,' which my small understanding is that usually means carrying a gun.  'Thirteen here comes even more.'  He's talking about who he gonna kill.  'Man, just grab a gun, we're gonna kill some fucking tintos.'"  The trial court wanted to know, however, whether the prosecution would be recalling the gang expert to explain the lyrics.  The prosecutor responded that Detective Benavides could give the explanation.

The court stated it was going to admit the lyrics over the defense's objection.  "I think this is highly relevant.  You're going to have someone, an individual who, even years after these events, years after the murder is still carrying on, and pardon this expression, but a love affair with the Eastside Treces.  I mean, this is obviously an ode to his loyalty and involvement with Eastside Treces, and under [Evidence Code section] 352 this is extremely relevant, if this was found with him today."  The court added that it was also relevant to the issue of whether Gomez wrote the comments in the yearbook.  The court acknowledged that the evidence was "prejudicial, but it has very strong probative value, and I'm only letting them in for a limited purpose of indicia of gang membership.  I will tell the jury that as soon as she tries to admit these."

Rap song lyrics, like other evidence, may be "probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it."  (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 35; *People v. Olguin* (1994) 31

22

Cal.App.4th 1355, 1372-1373.) It is true, as the trial court recognized, that some of the lyrics were prejudicial, but the trial court properly weighed that prejudice against the probative value of the lyrics. "[T]he trial court exercises broad discretion in this area: 'Where . . . a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.] We cannot say that here." (*Olguin*, *supra*, at p. 1373.)

Moreover, the trial court properly admonished the jury that the court was admitting the rap song lyrics "for a limited purpose." The trial court instructed the jury: "What I mean by that is it's similar to what I said about the book, the yearbook and so forth. The statements contained on the paper are not being admitted for the truth, but they're being admitted, if you so find, as indicia or possible indicia of gang membership, okay?" We presume the jury followed this instruction in the absence of evidence to the contrary. (*People v. Pearson* (2013) 56 Cal.4th 393, 414; *People v. Boyette* (2002) 29 Cal.4th 381, 436; see *People v. Waidla*, *supra*, 22 Cal.4th at p. 725 ["[t]he presumption is that limiting instructions are followed by the jury"]; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["[a]ny prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury," and "[w]e presume that jurors comprehend and accept the court's directions"].) Gomez does not point to any such evidence.

3.       Police Notebook

Exhibit No. 28, the police notebook, was "five stapled pages, two-sided, [which] would appear to have 16 head shots on each page," with names on the backs of the pages. It was admitted into evidence without objection.

Nine months after the shooting, on April 29, 2009, Detective Chong showed the police notebook to Cuevas. Cuevas was unable to identify the shooter from the

photographs.  Five months later, Detective Benavides showed a photographic lineup to Cuevas.  Cuevas identified Gomez's photograph from the lineup.

Gomez argues that the police notebook should have been excluded under Evidence Code section 352 as unduly prejudicial and confusing.  Although Gomez asserts that he objected to the admission of this exhibit, he does not include a citation to the record to support his claim.  The failure to object to the admission of the evidence waives any claim of error on appeal.  (*Id.*, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433-434.)

In any event, the admission of the exhibit did not prejudice Gomez.  Gomez argues that "by introducing the notebook full of gang pictures and making the argument that Cuevas was being careful when he selected Gomez's photo fourteen months after the shooting incident, the state was able, through subterfuge, to bolster its case by misleading the jury and confusing the issues."  Specifically, Gomez argues that because most of the pictures in the notebook did not match the descriptions of the shooters given by Cuevas, the fact that Cuevas did not identify the shooters from pictures in the notebook "did not tend to prove that Cuevas was being careful in his selection several months later when Detective Benavides prompted Cuevas's selection of Gomez by suggesting No. 5 to him."

Gomez does not identify anything in the record suggesting that the prosecution attempted to use Cuevas' failure to identify anyone in the notebook as proof that his selection of Gomez's photograph from the photographic lineup was "careful" and accurate.  As noted above, Gomez's assertion that Detective Benavides "prompted Cuevas's selection" of his photograph is speculative.

Evidence is prejudicial within the meaning of Evidence Code section 352 if it "'"uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues."'"  (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)  The police notebook did not meet this definition.  Moreover, Cuevas was unable to identify either of the shooters from the photographs in the notebook.  Cuevas did make an identification from the photographic lineup Detective Benavides subsequently showed him, and counsel for Gomez cross-

24

examined Cuevas on the accuracy of the identification.  It is not reasonably probable that the admission of the notebook confused the jury, or that the jury would have acquitted Gomez in the absence of its admission.  (Evid. Code, § 353, subd. (b); see *People v. Earp* (1999) 20 Cal.4th 826, 878 [reversal for the erroneous admission of evidence is not required unless it is reasonably probable the defendant would have obtained a more favorable result had there been no error].)

## III.    PROSECUTORIAL MISCONDUCT

### A.    *Standard of Review and Waiver of Claims*

"In general, a prosecutor commits misconduct by using deceptive or reprehensible methods of persuasion.  [Citations.]  It is generally not necessary for the defendant to show the prosecutor acted in bad faith because the prosecutor's conduct is evaluated in accordance with an objective standard.  [Citation.] '"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct."'  [Citations.]"  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133; see *People v. Fuiava* (2012) 53 Cal.4th 622, 727 ["[t]he prevalence of asserted misconduct raised for the *first time on appeal* cannot establish that, had defense counsel made proper objections at trial, the trial court would have consistently overruled those objections, the prosecutor would have persisted in engaging in the asserted misconduct, or the jury would have been alienated by defendant's bringing the prosecutor's asserted improprieties to the court's attention"].)  Reversal for prosecutorial misconduct is not required unless the defendant has been prejudiced by the misconduct (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564; see, e.g., *People v. Fierro* (1991) 1 Cal.4th 173, 209), which occurs only if it is reasonably probable the defendant would have obtained a more favorable result absent the misconduct (Cal. Const., art. VI, § 13; *People v. Tully* (2012) 54 Cal.4th 952, 1010; *People v. Crew* (2003) 31 Cal.4th 822, 839.)

25

B.		*The Prosecutor Did Not Engage in Prejudicial Misconduct by Asking an Improper Hypothetical Question*

Gomez argues that the prosecutor committed misconduct by improperly inserting hearsay into a hypothetical question posed to the gang expert, Officer Berdin.  The People correctly respond that Gomez waived this argument by failing to object to the prosecutor's question to the gang expert.  (See *People v. Thomas* (2012) 54 Cal.4th 908, 943 [defendant forfeits claims of prosecutorial misconduct by not objecting].)  Gomez concedes the point by not disputing that he failed to object or addressing the issue of waiver in his reply brief.

In any event, there was no prejudicial misconduct.  The alleged misconduct is based on a statement within a hypothetical question asking Officer Berdin his opinion of whether "this crime was committed to benefit the East Side Trece gang [and] in association with East Side Trece gang members."  The prosecutor asked Officer Berdin to assume several facts, including "that after the shooting the shooters entered a black Cadillac which was parked along the west side of Griffith, just south of the intersection of Griffith and Adams."[8]  Gomez argues that Salas and Smith were the only two individuals who connected the shooters to a black Cadillac, neither of them testified, and the People introduced the hearsay statements by Salas and Smith to Officer Wampler and Detective Chong not for the truth but only for the limited purpose of explaining Detective Chong's subsequent actions.  Gomez asserts that "[b]y inserting this hearsay into the hypothetical question to the gang expert, the prosecutor was able to link the Salgado brothers's [*sic*]

---

[8]		The hypothetical question also asked Officer Berdin to assume that the camera that captured the recording was located at 853 East Adams, the victim was found four buildings from the intersection of Griffith and Adams, the car screeched its tires as it fled the scene, the shooters seen in the video were admitted East Side Trece gang members, and the "same well-documented East Side Trece gang member was seen just moments before the shooting, standing with another male Hispanic near the scene of the shooting; and that both men appeared to be standing tall, as if looking for someone [and] that one of them had his hands in his pocket."  Gomez does not object to any of these portions of the hypothetical question.

26

black Cadillac to the crime scene, thereby bolstering Arlene Stewart's testimony, confusing the jury because one hearsay declarant described the Cadillac as a ragtop, and [the prosecutor] connected [Gomez] to the crime scene through the use of unsubstantiated hearsay."

There was other evidence, however, connecting the shooters to the Cadillac. Both Stewart's testimony and the video recording from the childcare center linked a black Cadillac to the crime scene. The jury also heard recordings of 911 calls, some of which mentioned a black Cadillac. It was reasonably inferable from the evidence that the shooters left the scene in a black Cadillac.

Experts may give opinions on the basis of hypothetical questions that ask the experts to assume the truth of certain facts. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) However, the "[u]se of hypothetical questions is subject to an important requirement. 'Such a hypothetical question must be rooted in facts shown by the evidence . . . .' [Citations.]" (*Id*. at pp. 1045-1046.) A hypothetical question ""'may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." [Citation.]"' (*Id*. at p. 1046.) The statement about the black Cadillac in the hypothetical question was properly based on the evidence.

Moreover, the trial court instructed the jury regarding hypothetical questions that "[i]n permitting this type of question, the court does not rule, and does not necessarily find that all of the assumed facts have been proved. It only determines that those assumed facts are within the possible range of the evidence. It is for you to decide from all the evidence whether or not the facts assumed in a hypothetical question have been proved. If you should decide that any assumption in a question has not been proved, you are to determine the effect of that failure of proof on the value and weight of the expert opinion based on the assumed facts." (CALJIC No. 2.82.) We presume the jury was able to follow this instruction (*People v. Holt* (1997) 15 Cal.4th 619, 662; *People v. Delgado*

27

(1993) 5 Cal.4th 312, 331) and properly evaluate Officer Berdin's answer to the hypothetical question.

C.     *The Prosecutor Did Not Improperly Vouch For Witnesses*

Gomez argues that the prosecutor improperly vouched for the credibility of two of the prosecution witnesses, Ramirez and Stewart. As with the hypothetical question to Officer Berdin, Gomez did not preserve this argument by making a timely objection in the trial court. Moreover, there was no improper vouching.

"'A prosecutor may make "assurances regarding the apparent honesty or reliability of" a witness "based on the 'facts of [the] record and the inferences reasonably drawn therefrom.'" [Citation.] But a "prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record." [Citation.]'" (*People v. Redd* (2010) 48 Cal.4th 691, 740; see *People v. Martinez* (2010) 47 Cal.4th 911, 958 ["[a] prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record"].) While argument generally is limited to matters in evidence, a prosecutor may also make arguments based on common knowledge or experience. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1026.)

The prosecutor stated: "But I'll tell you this. When I come home at night and there's a person outside that I don't recognize from my neighborhood, as a prosecutor, I'm very aware of who's in my neighborhood. A police officer who has been shot at before, who is running in a gang-infested area, is not like a person who is just, you know, walking going about his business. And I think that's, ladies and gentlemen, I think that's common sense. I think that it doesn't take a person who makes $100,000 a year coming in as an expert testifying to tell us about how people remember certain things."

To the extent the prosecutor talked about her personal experiences, her argument was improper. The prosecutor's argument regarding Ramirez's ability to remember the

28

face of the man he encountered, however, was "'based on the "facts of [the] record and the inferences reasonably drawn therefrom."'" (*People v. Turner* (2004) 34 Cal.4th 406, 432.) The prosecutor did not imply she had personal information outside the record that supported Ramirez's credibility.

The same is true of the prosecutor's argument about Stewart's credibility. After discussing Stewart's testimony, the prosecutor stated that the defense would probably attack Stewart's testimony based on her prior conviction for prostitution. The prosecutor argued that the prior conviction did not mean Stewart was not credible. She then stated: "And I would submit to you that if she was trying to lie, if she was trying to get somebody in trouble, she could have done a lot better job. She could have said that she saw the shooting. She could have said that she saw the gun in [Gomez's] hands. She could have said that it was [Gomez] who hurt her in the past. She could have said a lot of things that would have really done a lot of harm to the defense's case. But she didn't. Because what she did was she came in here and all she did was say what she saw that day, on July 29th, 2008." After reviewing portions of Stewart's testimony, the prosecutor added: "So did the defense demonstrate that she had any type of ax to grind against the defendant? Absolutely not. Because when that lady came in on Friday, she was nervous, but she was being honest. She told you that she was being honest."

Again, the prosecutor was not personally vouching for Stewart's credibility based on information she had outside the record. She was drawing reasonable inferences based on evidence in the record.

### D. *The Prosecutor Did Not Mischaracterize Evidence*

Finally, Gomez cites several instances in the prosecutor's closing argument that Gomez contends amount to prejudicial misconduct because the prosecutor was mischaracterizing or misstating the evidence. Again, trial counsel did not object to any of these statements by the prosecutor in closing argument, which Gomez does not dispute

amounts to waivers of these issues.[9]  In any event, the record does not support Gomez's contention.

Prosecutorial misconduct includes mischaracterizing or misstating the evidence. (*People v. Davis* (2005) 36 Cal.4th 510, 550; see *People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1268, review den. May 1, 2013.)  "Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct.  [Citations.]  A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.'  [Citation.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 823.)  Such misconduct requires reversal under federal standards "if it is so "'"'egregious'"'"" as to render the trial 'fundamentally unfair' under due process principles.  [Citation.]  Under state law, . . . the reviewing court considers the record as a whole to determine if the alleged harm resulted in a miscarriage of justice.  [Citation.]  In considering prejudice 'when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.  [Citation.]'"  (*People v. Caldwell*, *supra*, 212 Cal.App.4th at p. 1269.)

Gomez's list of purported mischaracterizations of the evidence focuses on minutiae, such as whether Cuevas told Detective Benavides that he did not see the shooters' faces or that he did not recall seeing the shooters' faces.  "'In the challenged

---

**9**      Rather than addressing the issue of waiver in his reply brief, Gomez repeats his previous arguments and identifies a new instance of prosecutorial misconduct.  This claim of misconduct, based on the prosecutor's comment that Cuevas may have been hesitant to identify Gomez because Cuevas did not want to be "victim number 2," is forfeited because Gomez did not raise it in his opening brief.  "'Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . .  Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before.  [Citations.]  No good cause is shown here.'"  (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93, quoting *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.)

30

remarks, the prosecutor did not substantially misstate the facts or go beyond the record. Ultimately, the test for misconduct is whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury. [Citation.]'" (*People v. Gonzales* (2011) 51 Cal.4th 894, 947.) There is no evidence that the prosecutor engaged in any such conduct here.

Moreover, the trial court instructed the jury that it "must determine what facts have been proved from the evidence received in the trial and not from any other source" (CALJIC No. 1.00), and that "[s]tatements made by the attorneys during the trial are not evidence." (CALJIC Nos. 0.50, 1.02.) "Arguments by counsel 'generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed as the statements of advocates . . . .' [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 438.) In light of the relatively minor nature of the remarks Gomez complains about and the trial court's instructions, it is not reasonably probable that the jury based its verdict on any misstatements of the evidence. Therefore, any alleged misconduct was harmless. (*Ibid*.; *People v. Caldwell*, *supra*, 212 Cal.App.4th at p. 1269.)


IV.    NEW TRIAL MOTION


Gomez argues that the trial court denied his due process right to a fair hearing and demonstrated judicial bias when it failed to review the evidence Gomez presented in support of his new trial motion. Gomez's argument does not fairly and accurately state what occurred in the trial court.

Gomez moved for a new trial based on insufficiency of the evidence. (Pen. Code, § 1181, subd. 6.) His argument was that the video recording from the childcare center "conclusively proves that testimony given by Jose Ramirez and Arlene Stewart cannot be considered reliable." At the hearing on the motion, counsel for Gomez asked if the trial court had a chance to review the recording. The trial court answered, "Actually, I did not." Counsel for Gomez proceeded to attack the credibility of the two witnesses because

31

their testimony "flies in the face of what actually happened that is depicted on the videotape." When the trial court asked him to explain, counsel for Gomez responded, "it's just so disheartening for me to even have you ask that question because it just shows that the court has accepted the version just like the jury did." Counsel for Gomez explained, "You have a witness saying he saw a person on a street that he couldn't have seen. You have witness saying a person was in a car; that couldn't have happened. The video is the best evidence. It shows what happened, and it's inconsistent with the People's version."

The trial court responded that it had reviewed the evidence the night before, though it did not look at the recording, and conducted an independent review of the evidence. The court determined that there was substantial evidence from which the jury could have found beyond a reasonable doubt that Gomez committed the crime. The court stated that it found Cuevas, Ramirez, and Stewart were credible witnesses, even though the court acknowledged that "their testimony is not perfect—it's not a hundred percent this is absolutely the way" things occurred. The court therefore denied Gomez's new trial motion.

Penal Code section 1181, subdivision 6, provides a trial court may grant a new trial "[w]hen the verdict or finding is contrary to law or evidence." On a motion for a new trial, the trial court weighs the evidence independently. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Davis* (1995) 10 Cal.4th 463, 523.) "It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.]" (*Davis*, *supra*, at p. 524; accord, *Guerra*, *supra*, at p. 1159.) A motion for new trial is addressed to the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. (*Guerra*, *supra*, at pp. 1159-1160; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127.) There is a strong presumption that the trial court properly

exercised its discretion, so abuse must appear clear and unmistakable. (*Guerra*, *supra*, at pp. 1159-1160; *Davis*, *supra*, at p. 524.)

Although the trial court did not review the video recording before the hearing on Gomez's motion for a new trial, the trial court had seen the recording during trial. The trial court was aware of the imperfections in the eyewitnesses' testimony but still found the witnesses credible. The court conducted the required independent review of the evidence and concluded that substantial evidence supported the verdict. No """"manifest and unmistakable abuse of discretion clearly appears."' [Citation.]" (*People v. Davis*, *supra*, 10 Cal.4th at p. 524; see *People v. Guerra*, *supra*, 37 Cal.4th at p. 1160.) The trial court did not deprive Gomez of his due process right to a fair trial or subject Gomez to judicial bias by denying Gomez's motion for a new trial without (again) viewing the video recording.

V.    CONSIDERATION OF GOMEZ'S JUVENILE STATUS DURING
      SENTENCING

Gomez was 17 years old at the time of the murder. He was tried as an adult. At the sentencing hearing the trial court imposed a sentence of 50 years to life—25 years to life for first degree murder and an additional 25 years to life for the firearm use pursuant to Penal Code section 12022.53, subdivisions (d) and (e).

Gomez argues that the trial court imposed "the same sentence an adult would receive" "[w]ithout any individualized consideration for [his] age or lack of any serious prior criminal record." Gomez contends that Welfare and Institutions Code section 707, subdivision (d), which permits a juvenile to be tried as an adult, violates the Eighth Amendment's prohibition of cruel and unusual punishment "because it fails to consider a juvenile's individual characteristics before treating the child as an adult." Gomez also contends that his sentence of 50 years to life violates the Eighth Amendment, due process, and equal protection, and that the trial court abused its discretion by failing to consider Gomez's juvenile status at the time of sentencing.

By statute the minimum sentence for first degree murder is 25 years to life. (Pen. Code, § 190, subd. (a).) The sentence for firearm use under Penal Code section 12022.53, subdivisions (d) and (e), is also 25 years to life. The People requested imposition of a sentence of 50 years to life. At the sentencing hearing, counsel for Gomez did not object to the sentence of 50 years to life. Gomez's failure to object forfeited any claim of error with respect to the factors the trial court considered in sentencing Gomez. (*People v. Scott* (1994) 9 Cal.4th 331, 356; see *People v. Gonzalez* (2003) 31 Cal.4th 745, 751.) As a general rule, "an appellant forfeits claims of error through inaction that prevents the trial court from avoiding or curing the error." (*People v. Garcia* (2010) 185 Cal.App.4th 1203, 1214; see *People v. McCullough* (2013) 56 Cal.4th 589, 593.) "'Claims of error relating to sentences "which, though otherwise permitted by law, were imposed *in a procedurally* or factually *flawed manner*" are waived on appeal if not first raised in the trial court. [Citation.]'" (*Garcia*, *supra*, at p. 1218.) There is, however, "''"a narrow exception" to the waiver doctrine that normally applies where the sentence "could not lawfully be imposed under any circumstance in the particular case . . . ."''" (*Ibid*.)

Welfare and Institutions Code section 707, subdivision (d)(1), provides that "the district attorney or other appropriate prosecuting officer may file an accusatory pleading in a court of criminal jurisdiction against any minor 16 years of age or older who is accused of committing an offense enumerated in subdivision (b)." Section 707, subdivision (b), includes both murder and firearm use in violation of Penal Code section 12022.53. (Welf. & Inst. Code, § 707, subd. (b)(1) & (17).) The California Supreme Court has upheld the constitutionality of Welfare and Institutions Code section 707, subdivision (d). (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 559; *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1490; *People v. Cavallaro* (2009) 178 Cal.App.4th 103, 116.) We are bound by the Supreme Court's holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *People v. Whitaker* (2013) 213 Cal.App.4th 999, 1008-1009; *In re Stevenson* (2013) 213 Cal.App.4th 841, 868.)

Gomez further contends that we must remand the case for resentencing in order for the trial court to consider his age under *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407]. In *Miller*, two 14-year-old defendants "were convicted of murder and sentenced to life imprisonment without the possibility of parole. In neither case did the sentencing authority have any discretion to impose a different punishment. State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate. Such a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' *Graham v. Florida*, 560 U.S. ___, ___, ___, 130 S.Ct. 2011, 2026-2027, 2029-2030, 176 L.Ed.2d 825 (2010), and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." (*Miller*, *supra*, at p. ___ [132 S.Ct. at p. 2460.) The Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Id.* at p. ___ [132 S.Ct. at p. 2460].) The court did not ban imposition of a sentence of life without parole on a juvenile offender, but it did require sentencing courts to consider the differences between children and adults, "and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. ___ [132 S.Ct. at p. 2469], fn. omitted.)

Here, the trial court sentenced Gomez to 50 years to life, not life without the possibility of parole. *Miller* does not hold that such a sentence is unconstitutional, nor does *Miller* require us to remand for resentencing to require the trial court to consider the factors set forth in the Supreme Court's opinion in *Miller*.

Gomez argues that *Miller* applies because his sentence was the "equivalent" of a term of life without the possibility of parole. (See *People v. Caballero* (2012) 55 Cal.4th 262, 267-268). Gomez was 20 years old when sentenced. He received 340 days of custody credits, so that he will have to serve approximately 49 years before he is eligible for parole when he is approximately 69 years old. His life expectancy is about 76 years.

35

(See *People v. Mendez*, *supra*, 188 Cal.App.4th at p. 63.)  Therefore, his sentence is not the equivalent of a sentence of life without the possibility of parole.  (See *ibid*. [because the defendant's life expectancy was 76 and the defendant would not be eligible for parole until he was 88, "his sentence and an LWOP sentence are 'materially indistinguishable'"].)  Gomez's sentence is a long one, commensurate with and appropriate for the nature of his crime, but it is not the equivalent of life without the possibility of parole and it is not unconstitutional under *Miller*.

Gomez also argues that his sentence violates equal protection because, had he received a sentence of life without the possibility of parole, under *Miller* the trial court would have had the discretion to reduce his sentence to 25 years to life.  Gomez, however, received a sentence of 25 years to life.  The additional 25 years to life was for the use of a firearm in the commission of a gang-related crime.  (Pen. Code, § 12022.53, subds. (d), (e).)  "'"The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment."'  [Citation.]  'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.'  [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'  [Citation.]"  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253; see *People v. Barrett* (2012) 54 Cal.4th 1081, 1107; *People v. Guzman* (2005) 35 Cal.4th 577, 591-592.)  Gomez is not similarly situated to a murderer who is not subject to a mandatory 25 years to life firearm use enhancement.

VI.     INEFFECTIVE ASSISTANCE OF COUNSEL

A.     *Standard of Review*

The Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide a criminal defendant with the right to the effective

assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) Thus, a defendant is entitled to "'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.'" (*Ledesma*, *supra*, at p. 215; *In re Jones* (1996) 13 Cal.4th 552, 566; *In re Edward S.* (2009) 173 Cal.App.4th 387, 406.)

"'To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]' [Citation.]" (*In re Roberts* (2003) 29 Cal.4th 726, 744-745; see *Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *People v. Huggins* (2006) 38 Cal.4th 175, 205-206.) "'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 656; see *People v. Williams* (1988) 44 Cal.3d 883, 933 ["[a] factual basis, not speculation, must be established before reversal of a judgment may be had on grounds of ineffective assistance of counsel"]; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008 ["[i]t is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different"].) We "must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance," and the "defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances." (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) We "'make every effort . . . to evaluate counsel's conduct from counsel's perspective at the time. [Citation.]' [Citation.]" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1210, italics omitted.)

B.   *Counsel for Gomez Was Not Ineffective by Failing To Make a Motion in Limine To Exclude the Yearbook*

Gomez first argues that his trial counsel was ineffective because he failed to make a motion in limine to exclude the yearbook in its entirety.  Because the trial court properly ruled that portions of the yearbook were admissible, it is not reasonably probable that the trial court would have ruled the entire yearbook inadmissible had Gomez's counsel challenged its admission by moving in limine to exclude it.  Therefore, the failure to make the motion did not constitute ineffective assistance of counsel.  (*People v. Williams* (2013) 56 Cal.4th 630, 690; *In re Cudjo* (1999) 20 Cal.4th 673, 687; see *People v. Thompson*, *supra*, 49 Cal.4th at p. 122 ["[c]ounsel is not ineffective for failing to make frivolous or futile motions"].)

C.   *Counsel for Gomez Was Not Ineffective by Failing To Object to Gang Graffiti*

Gomez next contends that his trial counsel should have objected to evidence of the graffiti depicting "20K" and "30K," both crossed out, which Officer Berdin explained meant that the writers were killers of members of the Rolling 20 Outlaws and Rolling 30 Pirus gangs.  This evidence was relevant to the issue on the issue of "defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like," which "can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."  (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049.)  Trial counsel for Gomez did not have to make a futile objection to exclude the evidence.  (*People v. Thompson*, *supra*, 49 Cal.4th at p. 122.)

D.   *Counsel for Gomez Was Not Ineffective by Failing To Object to Prosecutorial Misconduct*

Gomez further contends his counsel was ineffective for failing to object to prosecutorial misconduct.  As discussed above, there was no prejudicial prosecutorial

misconduct. Therefore, the failure to object did not constitute ineffective assistance of counsel. (*People v. Williams*, *supra*, 56 Cal.4th at p. 690; *In re Cudjo*, *supra*, 20 Cal.4th at p. 687.)

E.      *Issues Regarding Closing Argument and Sentencing*

In closing argument, counsel for Gomez stated: "Let me make this easy for you. Whoever did this, this was a first degree murder. They rolled by, they saw Mr. Van Ellis, they parked, and then they walked up kind of slow, not together. Like they hunted him down and shot him dead. This is a first degree willful, premeditated murder. No if's, and's, or but's [*sic*]. Don't compromise. Don't even worry about second degree. Don't worry about whether or not it's for the benefit of a gang or if there is a use of a gun. It is all true. The only issue in this case is the identity. Have they proved to you beyond a reasonable doubt [Gomez] is the one?"

Gomez argues that his trial counsel was ineffective for conceding that this was a gang-related first degree murder with use of a gun. He acknowledges the Supreme Court's statement in *People v. Davenport* (1995) 11 Cal.4th 1171, 1237: "'Recognizing the importance in maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt.' [Citation.]"[10] Gomez appears to argue that the principle expressed in *Davenport* does not apply in this case because Davenport was an adult while Gomez was a juvenile at the time of their respective crimes. We see no reason why *Davenport* would be inapplicable merely because Gomez was a juvenile at the time he committed his crimes.

Where, however, as here, "'"'the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,'" the claim [of ineffective assistance of counsel] on appeal must be rejected.'

[10]     The Supreme Court disapproved *Davenport* on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, footnote 5.

[Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) The claim "is more appropriately decided in a habeas corpus proceeding." (*Id*. at pp. 266-267.) Because there is nothing in the record to indicate why trial counsel conceded that this was a gang-related first degree murder, Gomez's claim is more appropriately raised on habeas corpus and we reject it on appeal. (*Ibid*.)

Gomez briefly asserts, without citation to any supporting authority, that "trial counsel had a duty to his client to make the jury aware that they should consider his juvenile status, and the impulsive nature of juveniles, in evaluating whether the charge was first degree or second degree murder." Gomez does not sufficiently develop and support this assertion for appellate review. "We discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19, disapproved on another ground in *People v. Griffin*, *supra*, 33 Cal.4th at p. 555, fn. 5; see *People v. Redd*, *supra*, 48 Cal.4th at p. 744 [claim not considered where defendant failed to offer explanation of how prosecutor's comment was improper]; *People v. Barnett*, *supra*, 17 Cal.4th at p. 1182 [defendant's failure to support claim "with adequate argument" is rejected "as not properly raised"].) Moreover, Gomez's assertion improperly suggests that his trial counsel should have made an argument that was unsupported by evidence in the record. (See *People v. Turner*, *supra*, 34 Cal.4th at p. 432 [argument must be "'based on the "facts of [the] record and the inferences reasonably drawn therefrom"'"].)

Gomez also complains of his counsel's failure to raise the issue of his juvenile status at the time of sentencing. As explained above, the trial court imposed a statutorily mandated and constitutional sentence. Gomez was a gang member who chased down and shot an unarmed man for no reason other than the color of the man's skin and the color of his shorts. It is not reasonably probable Gomez would have received a more favorable sentence had his counsel raised his juvenile status at the sentencing hearing. Gomez's

40

trial counsel was not ineffective for not mentioning at sentencing that Gomez was ten months from adulthood when he murdered his victim.

F.     *Issues Regarding Counsel for Gomez's Failure To Object To Unreliable Identification Evidence*

Gomez argues that his counsel should have filed a pretrial motion to exclude unreliable identification evidence.  The Supreme Court has stated that in a case based on a pretrial identification of the defendant by a witness, "a penetrating concern as to the propriety of [the] pretrial identification should be a commonplace consideration . . . [and] 'defense counsel . . . should consider an attack upon the identification procedure . . . on the ground that the confrontation was unfair.'"  (*People v. Nation* (1980) 26 Cal.3d 169, 179.)  If defense counsel fails to make a potentially meritorious objection to identification evidence, the defendant may be able to demonstrate ineffective assistance of counsel by showing that the pretrial identification procedure "'resulted in such unfairness that it infringed his right to due process of law.'"  (*Ibid*.)  What Gomez fails to demonstrate is that such a motion was potentially meritorious.  As discussed above, the evidence Gomez challenges was admissible.  Therefore, his counsel was not ineffective for failing to make the motion.  (See *People v. Thompson*, *supra*, 49 Cal.4th at p. 122; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082.)

In his reply brief, Gomez claims that his counsel was ineffective for failing to challenge Cuevas' identification of him from the photographic lineup based on Officer Benavides' statement in the transcript, "That one?  Number Five?"  Gomez's failure to raise this claim of ineffective assistance of counsel in his opening brief, however, forfeits the argument on appeal.  (*People v. Clayburg*, *supra*, 211 Cal.App.4th at p. 93; *People v. Baniqued*, *supra*, 85 Cal.App.4th at p. 29.)  Moreover, as with Gomez's argument that his trial counsel's closing argument was ineffective, the record is not sufficient for us to determine whether trial counsel for Gomez was ineffective for failing to object to Cuevas' identification.  As discussed above, there is no way to determine from the transcript whether Detective Benavides suggested Number Five and Cuevas then picked

that photograph, or whether Cuevas first circled Number Five and Detective Benavides then sought to confirm his selection. "Under such circumstances, a claim of ineffective assistance is generally rejected on direct appeal and more properly raised in a petition for habeas corpus, which can include declarations and other information outside the appellate record that reveal the reasons for the challenged conduct. [Citation.]" (*People v. Witcraft* (2011) 201 Cal.App.4th 659, 665; see *People v. Gray* (2005) 37 Cal.4th 168, 211.)

VII.   RESTITUTION

One of the claims for restitution was from Van Ellis'mother, Charlotte Van Ellis, who sought $2,541.60 for her dental expenses. She claimed that the stress of the trial caused her to grind and ultimately break three of her teeth. Over Gomez's objection, the trial court, relying on *People v. Keichler* (2005) 129 Cal.App.4th 1039 and *People v. Millard* (2009) 175 Cal.App.4th 7, included this amount as restitution. Gomez argues on appeal that the trial court should not have included Mrs. Van Ellis' dental expenses in the restitution order, and that there is no substantial evidence of the amount of these expenses.

"Restitution is constitutionally and statutorily mandated in California." (*People v. Keichler*, *supra*, 129 Cal.App.4th at p. 1045; see Cal. Const., art. I, § 28; Pen. Code, § 1202.4.) Penal Code section 1202.4 (section 1202.4), subdivision (f), provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." "Victim" for purposes of section 1202.4 includes "[t]he immediate surviving family of the actual victim." (*Id*., subd. (k)(1).)

We review a restitution order for abuse of discretion. "'A victim's restitution right is to be broadly and liberally construed.' [Citation.] '"When there is a factual and

42

rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court."' [Citations.]" (*In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132; accord, *People v. Keichler*, *supra*, 129 Cal.App.4th at p. 1045.) "However, when the propriety of a restitution order turns on the interpretation of a statute, a question of law is raised, which is subject to de novo review on appeal. [Citation.]" (*People v. Williams* (2010) 184 Cal.App.4th 142, 146 ; see *In re K.F.* (2009) 173 Cal.App.4th 655, 661.)

In *People v. Keichler*, *supra*, 129 Cal.App.4th 1039, on which the trial court relied, the defendant got into a fight with three victims. The three victims sought restitution for the cost of traditional Hmong healing ceremonies and herbal medicines. (*Id*. at pp. 1042-1043.) The court held: "The restitution statute allows for recovery of a broad variety of economic losses that are incurred as a result of the defendant's criminal conduct. (§ 1202.4, subd. (f)(3).) The illustrative list of items for which restitution may be ordered 'includ[es], but [is] not limited to' payment for the value of stolen or damaged property, medical expenses, mental health counseling expenses, wages or profits lost by the victim, noneconomic losses including psychological harm, interest, attorney fees, moving expenses, extra security, and expenses to retrofit a house or car to make them accessible. (§ 1202.4, subd. (f)(3).)" (*Keichler*, *supra*, at p. 1046.) The court stated: "Because the statute uses the language 'including, but not limited to' these enumerated losses, a trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior, even if not specifically enumerated in the statute. [Citation.]" (*Ibid*.) The court allowed restitution for the Hmong healing ceremonies and herbal medicines because they were the "equivalent of western medical expenses" and the victims "underwent these traditional Hmong healing ceremonies because [the] defendant injured them." (*Id*. at p. 1047.)

In *People v. Jones* (2010) 187 Cal.App.4th 418, on which Gomez relies, the court analyzed the meaning of the phrase "incurred *as the result of* the defendant's criminal conduct" in section 1202.4, subdivision (f)(3), using the traditional tort law notion of proximate causation. (Italics added.) The court saw "no reason why the various

43

principles involved in determining proximate causation under California tort law should not also apply in awarding victim restitution under California criminal law. As we have noted, under the governing statute, '[t]o the extent possible, [a] restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred *as the result of* the defendant's criminal conduct . . . .' (Pen. Code, § 1202.4, subd. (f)(3), italics added.) The causal connection embodied in the words 'as the result of' is certainly indicative of direct causation. Just as in tort law, however, the law must impose limitations on liability for victim restitution other than simple direct causality or else a defendant will face infinite liability for his or her criminal acts, no matter how remote the consequence." (*Jones*, *supra*, at p. 425.) After surveying causation in other areas of law, the court concluded that criminal restitution awards should be determined in a manner "consistent with the principles of proximate causation." (*Id*. at p. 427; see *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320-1321.)

We agree with *Jones* that a trial court should apply a proximate cause analysis when awarding restitution under section 1202.4, subdivision (f)(3). Proximate causation and foreseeability play a role in criminal liability and sentencing. "'The principles of causation apply to crimes as well as torts. [Citation.] "Just as in tort law, the defendant's act must be the legally responsible cause ('*proximate cause*') of the injury, death or other harm which constitutes the crime."' [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1324; see *People v. Dawson* (2009) 172 Cal.App.4th 1073, 1093-1094.) The proximate cause of a harm "'is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [harm] and without which the [harm] would not occur.' [Citation.]" (*Brady*, *supra*, at p. 1324; accord, *Dawson*, *supra*, at p. 1094.) Forseeability also ensures that a defendant's punishment is commensurate with his moral culpability. (*Dawson*, *supra*, at p. 1094; *Brady*, *supra*, at pp. 1324-1325; see *People v. Roberts* (1992) 2 Cal.4th 271, 316, 319-320.)

44

In *People v. Keichler*, *supra*, 129 Cal.App.4th 1039 the expenses incurred for the traditional Hmong healing ceremonies and herbal medicines were directly connected to the defendant's acts. The defendant injured the victims, then they obtained medical treatment for their injuries. The medical expenses were forseeable and proximately caused by the defendant's conduct. In contrast, Charlotte Van Ellis' dental expenses were neither a direct result of Gomez's actions nor reasonably foreseeable. Her dental expenses did not arise from stress caused by Gomez's murder of her son, but by the experience of the trial that occurred almost three years later. Mrs. Van Ellis chose to attend the trial, the trial caused her stress, the stress caused her to grind her teeth, and the teeth-grinding caused her to break three teeth and incur dental expenses. These expenses were not the direct, natural and probable consequence of Gomez's murder of Van Ellis nor were they reasonably forseeable. (See *People v. Roberts*, *supra*, 2 Cal.4th at pp. 316, 319-320; *People v. Dawson*, *supra*, 172 Cal.App.4th at p. 1094; *People v. Brady*, *supra*, 129 Cal.App.4th at pp. 1324-1325.). The trial court erred by awarding $2,541.60 for Charlotte Van Ellis' dental expenses, and the restitution award must be reduced from $14,915.51 to $12,373.91.

## VIII.   OTHER CLAIMS OF ERROR

Gomez asserts that the cumulative effect of what he claims were errors in his trial deprived him of due process and a fair trial. As discussed above, however, any errors were relatively minor. It is not reasonably probable that the result would have been any different had there been no error. (*People v. Cardenas*, *supra*, 31 Cal.3d at p. 907; see *People v. Loy* (2011) 52 Cal.4th 46, 77.)

In his reply brief, Gomez asserts that the trial court's calculation of his pretrial custody credits was incorrect and Gomez requests that we make the correction. As explained above, this claim of misconduct is forfeited because Gomez did not raise it in his opening brief. (*People v. Clayburg*, *supra*, 211 Cal.App.4th at p. 93; *People v. Baniqued*, *supra*, 85 Cal.App.4th at p. 29.) In addition, this is not the right court for this

claim. "The most expeditious and . . . the appropriate method of correction of errors of this kind is to move for correction in the trial court. It is the obligation of the superior court, under [Penal Code] section 2900.5, to calculate the number of credit days and include same in the abstract of judgment ([Pen. Code,] § 2900.5, subd. (d)). If a dispute arises as to the correct calculation of credit days, such should be presented on noticed motion 'for resolution to the court which imposed the sentence and which has ready access to the information necessary to resolve the dispute.' [Citation.]" (*People v. Fares* (1993) 16 Cal.App.4th 954, 958.)

## DISPOSITION

The judgment is modified to order restitution in the amount of $12,373.91 pursuant to section 1202.4, subdivision (f). In all other respects, the judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

SEGAL, J.*

We concur:

WOODS, Acting P. J.

ZELON, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.